WHATLEY DRAKE & KALLAS, LLC
Edith M. Kallas, Esq. (Admitted *Pro Hac Vice)*
ekallas@wdklaw.com
Ilze Thielmann, Esq. (Admitted *Pro Hac Vice*)
ithielmann@wdklaw.com
380 Madison Avenue, 23rd Floor
New York, NY 10017
Tel: (212) 447-7070
Fax: (212) 447-7077

THE CONSUMER LAW GROUP
Alan M. Mansfield (SBN: 125998)
alan@clgca.com
10200 Willow Creek Road, Suite 160
San Diego, CA 92131
Tel: (619) 308-5034
Fax: (888) 341-5048

Attorneys *for Plaintiffs*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| CAROL GALVAN, and LOLIS TACKWOOD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KROSSLAND COMMUNICATIONS, INC.; and ALLCOM TELINK CORPORATION,<br><br>Defendants. | CASE NO. 8:08-CV-00999 JVS (ANx)<br><br>**CLASS ACTION**<br><br>**SUPPLEMENTAL DECLARATION OF ALAN M. MANSFIELD IN SUPPORT OF JOINT MOTION FOR ENTRY OF ORDER PRELIMINARILY APPROVING SETTLEMENT AND CLASS NOTICE PROGRAM**<br><br>Date: May 14, 2012<br>Time: 1:30 p.m.<br>Judge: Hon. James V. Selna<br>Trial Date: Vacated<br>Jury Trial Demanded<br><br>Complaint Filed: September 5, 2008 |

I, ALAN M. MANSFIELD, declare as follows:

1. I am an attorney at law admitted to practice before this Court and am an attorney with the Consumer Law Group of California, one of the attorneys of record for Plaintiffs in this action.

2. As I was one of the principal counsel of record directly involved in the negotiations over the terms of this settlement, I have personal knowledge of the matters set forth in this Supplemental Declaration, which is filed in further support of the parties' Joint Motion for Entry of Order Preliminarily Approving Settlement and Class Notice Program. If called to testify, I could and would competently testify to the following facts stated herein.

3. The Court has initially denied preliminary approval of this settlement (Dkt. 145), raising six issues for which the Court has requested further information. The parties have met and conferred over those issues and, as set forth herein, agreed to modify the proposed settlement in several ways that hopefully will address the Court's concerns. In addition, I submit this Supplemental Declaration to provide the Court with additional information that I believe supports the reasonableness of the proposed settlement for purposes of both preliminary and final settlement approval.

4. The first issue raised by the Court in its April 27, 2012 Order was the reasonableness of the amount of the cap proposed in settlement, and the basis for determining whether it is reasonable. As an initial matter, this was a settlement negotiated under the auspices of Magistrate Judge Arthur Nakazato, who spent significant time in mediation with Krossland Communications, Inc. ("Krossland") discussing the terms of this settlement and the reasonableness of the settlement terms. Plaintiffs would have no objection to the Court conferring with Magistrate Judge Nakazato to obtain his views as to the terms of the settlement and the parties' efforts during the mediation to reach an accommodation based on the present realities of Krossland's financial position. I raise this as the first issue to consider

because, as I referenced in paragraph 8 of my previous Declaration in support of preliminary settlement approval (constrained by the fact some of the information was received during the mediation process), the primary reason we agreed to this cap at this level was Krossland's ability to fund any settlement.

5. The Court will recall that in August 2010 we had presented a settlement to the Court with Allcom Telink Corporation. Prior to the continued hearing on preliminary approval, Allcom simply dissolved, with no bankruptcy proceedings, resulting in the Class members receiving no recovery from Allcom. Being that Allcom was one of Krossland's primary vendors, this presented substantial concerns in our negotiations with Krossland as to its financial condition.

6. Based on counsels' investigation, it appears that the introduction of alternative international cell phone plans and internet Voice Over Internet Protocol telecommunications services has had a negative impact on the pre-paid calling card industry. Since this action was filed, according to information we have received from Krossland, and other companies in the industry (including Allcom), sales and usage has declined significantly such that the financial ability for companies such as Krossland to provide any significant amount in recovery has become a primary factor in settlement negotiations.

7. Krossland is not a calling card service provider, but instead a calling card distributor that operates almost exclusively in California and has less than 20 employees. Thus, unlike other similar settlements, it cannot simply issue Refund PINs but needs to purchase them in the open market. Moreover, Krossland's owner and president, Jesse Ahn, has made it clear that based on the significant reduction in calling card sales over the last two years, if this matter does not settle and proceeds to trial, he will simply dissolve the company, as it has no substantial physical assets.

8. We pressed for a higher cap in settlement, but the amount agreed to in the mediation with Magistrate Judge Nakazato was what Krossland was willing to

pay, with the expressed alternative being not only the risks and delays inherent in trial but the likelihood no consideration would be ultimately paid to the Class absent such a settlement. Thus, it is my informed belief that the alternative to this settlement in terms of continued proceedings or a trial will result in the Class members likely receiving no consideration at all.

9. I believe, and the Court can verify this with counsel for Krossland and Magistrate Judge Nakazato, we were able to obtain in settlement the most Krossland was willing to pay considering its present financial condition. This is further evidenced by the fact counsel are only requesting reimbursement of less than 10% of our total lodestar and expenses based on Krossland's financial position. That financial condition was a material reality we faced in negotiating this settlement, and a paramount factor in evaluating this settlement. It is one of the primary reasons why I believe the settlement should be preliminarily approved so as to seek the views and input of the Class members, the beneficiaries of this settlement.

10. The other primary consideration in terms of the cap is Krossland's potential liability under the facts of this case. Once pre-paid calling cards issued by other service providers that were distributed by Krossland from other cases that have settled are excluded from the Class, according to Krossland's data the total face value of the pre-paid calling cards at issue during the Class period is approximately $20 million. However, Krossland's average profit margin on the sale of the pre-paid calling cards it distributed is approximately five percent. From a restitutionary disgorgement standpoint (as one of Plaintiffs' theories is that it is not lawful under Cal. Bus. & Prof. Code § 17538.9(b)(17) and (18) to sell these calling cards without ensuring the required disclosures are made, and thus a proper remedy is the restitutionary disgorgement of any profits made from the sales of such cards), the total profit margin received by Krossland on the calling cards at issue is approximately $1 million. A cap of $250,000 is thus a reasonable

compromise of that total amount considering the potential risks at trial, the delay in payment and the economic reality that at the end of the day, any significant judgment even close to that amount would in all likelihood simply go unpaid and not benefit the Class members at all.

11. Another model we considered in evaluating this settlement is that, according to various independent studies, the average pre-paid calling card provides 50% to 60% of the represented minutes, which is why a 30% refund of the face value of the calling card is a significant return of consumers' estimated average losses. In support of this conclusion we previously submitted to the Court the Declaration of Julia Marlowe, Ph.D., providing her damage analysis based on studies she had performed on calling cards where the underlying service providers were several of the service providers for pre-paid calling cards distributed by Krossland. This Declaration is attached as Ex. 5 to the Declaration of Alan M. Mansfield in support of Plaintiffs' motion for class certification (Dkt. No. 116, "Mansfield Class Cert Decl."). In addition, studies by the U.S. Federal Trade Commission and other organizations confirmed a similar range of actual vs. represented minutes. *See* Ex. 1 attached hereto (Prepared Statement of the Federal Trade Commission on Pre-Paid Calling Cards Before the Committee on Commerce, Science and Transportation, September 10, 2008, at 7 and n. 10), and Ex. 2 attached hereto (Calling Card Verification Test Plan and Calling Card Study, The Hispanic Institute, 2007 (which was referenced in that FTC statement)). Applying this percentage range to the amount of pre-paid calling cards in question distributed by Krossland provides for a potential maximum Class-wide damages in the range of $8 million to $10 million, assuming full success at trial with Krossland being held responsible for this difference, which was attributable to the acts of the underlying service providers -- one of the arguments Krossland raised in terms of reducing its overall potential liability.

/ / /

12. While Plaintiffs' counsel recognize in negotiating this settlement this cap is a small percentage of that latter amount, in addition to the factors set forth above another relevant factor in determining the reasonableness of this amount is that class action settlements involving several of the largest underlying pre-paid calling card service providers. According to its public financial statements they sold hundreds of millions of dollars' worth of these cards nationwide; and they directly profited from the difference between actual vs. represented minutes. These settlements were in the $2-$3 million range, for longer class periods. For example, Locus Telecommunications settled on a class-wide basis for $3.6 million; Total Call International settled for $1.9 million (including refund PINs for international calls at 50 cents per minute)[1]; and Lycatel LLC settled for $2.25 million. All of these settlements were preliminarily and finally approved by federal district courts using a structure similar to the structure of this settlement, and were relied on by Krossland as part of the basis for only offering to settle at the level it did. The Refund PINs in these settlements were provided by the underlying service providers, not purchased on the open market by a distributor such as Krossland, and thus were sometimes (although not always) available at more favorable per minute rates. Information on these class action settlements can be reviewed at www.locustelecom.com/ltisettlement/main.shtml; www.totalcallusa.com/news;www.lycatelshop.com/web/uscallingcardsettlement.aspx. The orders finally approving these settlements can be presented to the Court if it would like to review them as well. When compared to these settlements, which involved much larger pre-paid calling card service providers who directly each

/ / /

/ / /

---

[1] The California Attorney General's Office was only able to obtain $300,000 in civil penalties against Total Call for violating the above statute, even though it was a Los Angeles-based company. *See www.oag.gov/news/press-release?id=1732.*

made ten times, if not significantly more, from the purchase and use of such pre-paid calling cards than Krossland and were for longer class periods, the amounts being made available to the Class under this settlement are reasonable.

13. In addition, the release provided for in this settlement (*see* Settlement Agreement, Dkt. 143, Ex. 1 at p. 6, ¶ I.M), unlike those settlements, specifically do not release claims of Class members against the underlying service providers for the pre-paid calling cards at issue. Thus, if settlements are reached with these service providers (other than Allcom), members of the Class would not be precluded from receiving additional compensation for the calling cards at issue. While there is no guarantee such settlements will be reached, it is another factor to consider in determining whether this settlement is within the range for settlement approval for purposes of preliminary, and ultimately final, approval.

14. The Court's second question was whether there was a basis to determine the reasonableness of the $16 maximum recovery for any Class member, in terms of average purchases per Class member or the average face value of the calling cards purchased during the class period. The calling cards distributed by Krossland had an average face value of between $2 and $5 (*see* Ex. 4 to Mansfield Class Cert. Decl.). While I was unable to locate any data on the average number of cards purchased by Class members in any of the above reported studies, Mr. Tackwood testified he purchased a $2 card on a weekly basis, and each of the above class action settlements had a limit on claims of up to 25 calling cards (or, in the case of Locus, any class member who made a claim for more than 25 PINs had to provide a list of those PINs). Providing a refund of 30 percent of the face value of the calling cards permits a consumer to submit a claim for 27 $2 cards or 11 $5 cards, which is in the range of these other settlements.

15. As with all settlements, there are trade-offs that are made in the course of negotiations, and lessening the proof requirement in exchange for this recovery cap was one of the important changes we believed was necessary to ensure Class

members could legitimately submit claims for multiple calling cards. As described in the full class notice from the Locus settlement (which can be reviewed at www.locustelecom.com/ltisettlement/main.shtml), in addition to the above limitations the class members in that settlement who did not still have a PIN from their Locus calling card were required to submit a notarized statement to file a claim. In many cases this likely would cost class members money to obtain (reducing their net benefit) and/or reduce the number of calling cards for which they could make a claim. Here, the parties are working with the proposed claims administrator, Garden City Group, to implement an electronic claims submission process and the claim form has no notarization requirement, increasing the likelihood Class members would be able to submit claims for multiple calling cards. I believe this is a relevant factor to consider in comparing this particular term in relation to those other settlements.

16. The Court's third question was that it believed there was no basis in the record to determine the reasonableness of the 20 cent rate for domestic calls and 50 cents for international calls, such as evidence of current market rates. In response to this expressed concern, Krossland has agreed to amend the settlement to provide that the Refund PIN rate would be 20 cents for any calls in the United States and landline calls anywhere in North, Central or South America, and 50 cents only for calls to international cell phones. Attached hereto as Ex. 3 is a true and correct copy of the executed Amendment No. 1 to the Settlement Agreement that reflects this modification. According to the public websites of companies such as T-Mobile, Verizon and AT&T Wireless, which I reviewed in preparing this Declaration, while the rates vary significantly, calls to or from international cell phones are billed at a rate from 59 cents to over $2.00 per minute to countries such as Mexico, Honduras and El Salvador.

17. As far as the reasonableness of the 20 cent rate, attached hereto as Ex. 4 is a printout I obtained on April 26, 2012, from wal-mart.com, the nation's largest

retailer, offering a pre-paid calling card from AT&T, one of the world's largest service providers. For a card that costs $10, a consumer can obtain 150 minutes of talk time, but only to seven states. For the vast majority of states, including California, Colorado (where Mr. Tackwood testified he made calls to using pre-paid calling cards), New York, Florida and Arizona, consumers only receive a maximum of 30 to 50 minutes of talk time. At 50 minutes, this equates to 20 cents a minute -- the same rate as provided under this settlement. At 30 minutes, this equates to approximately 33 cents a minute. This same statement notes "International rates are higher, rates may be higher for calls to/from mobile phones", further supporting the conclusion that the 50 cent rate for international cell phone calls is reasonable. Thus, as the per minute rates set forth in Amendment No. 1 are comparable to, if not better than, the rates for pre-paid calling cards established by one of the largest telecommunications companies and sold by one of the largest consumer retailers in the United States, I believe that is probative evidence of comparable current market rates. Again, it is worth noting that Krossland is required to go out in the open market to buy these cards, and thus it does not have the flexibility to simply issue more Refund PINs at a small incremental cost as did Locus and the other companies in the class action settlements referenced above.

18. The Court's fourth question was its concern that the six-month period for Refund PIN usage was unduly short.[2] This period of time was agreed to because for most pre-paid calling cards there is a 90-day to six-month usage period from the date of card activation. This lag time is required because there may be a significant time from when the card is distributed until the card is sold. For examples of this time period, see Ex. 4 to the Mansfield Class Cert. Decl. and Exs. 12-18 to the Reply Declaration of Alan M. Mansfield In Support of the Motion for Class Certification (Dkt. 125-1). Here, however, there is not a need to build in this

[2] The class notice references to four months was incorrect and has been corrected as noted herein.

lag time, since the Refund PINs would be sent to Class members for use as soon as the settlement is final, and would include a date certain for use so there is no confusion as to how long the PIN would be valid. Nevertheless, to address this question, the parties have agreed to extend this usage period to one year from the date the Refund PIN is issued, which is more than the typical usage period for pre-paid calling cards. See Ex. 3, Amendment No. 1 to Agreement.

19. The Court's fifth question was the question of incentive compensation to Carol Galvan in light of her prior exclusion as a Class representative. First, this amount was only negotiated after the other terms of the settlement benefitting the Class were agreed to by the parties with the assistance of Magistrate Judge Nakazato. Second, Paragraph 13 of the Agreement provides that Plaintiffs would collectively ask the Court, subject to the Court's discretion to award it, for a total payment of $2,000 -- an amount less than what I typically request be awarded to Class representatives who participate in depositions, answer requests for discovery and participate in mediation, which both of them did. Thus, while Ms. Galvan did participate in this action and was initially proferred as a Class representative, this request can be made or the amount awarded only for Mr. Tackwood and still be consistent with the provisions of the Agreement and the class notice. Whether the Court decides to award only Mr. Tackwood that amount or a lesser amount is within this Court's discretion at the time of final approval, and the Class representatives will of course abide by whatever the Court decides. However, this should not require modification of either the Agreement or the class notices since the notices refer to a request that would be made by the Plaintiffs, not specifically by whom. If the Court believes modification is required at this time, Plaintiffs will do so.

20. The Court's sixth question was that the settlement was unclear how proration of the settlement fund would be conducted in the event the number of claims submitted exceed the amount of the net settlement fund. Amendment No. 1

to the Agreement seeks to address this last issue. Refund PINs will be issued in 50 cent increments. If the amount of claims submitted exceed the amount of the net settlement fund, these claims will be added together for a total dollar claim amount, and the net settlement fund divided by that amount to calculate a percentage reduction. Each claim would then be divided by that percentage, and rounded up to the nearest 50 cent increment. So, for example, if a consumer submitted a claim for $50 worth of calling cards, and based on the above proration calculation his claim was to be reduced by 25%, his claim would be reduced to $37.50. Thirty percent of that amount is $11.25. Rounding up to the nearest 50 cent increment, that claimant would receive Refund PINs with a total value of $11.50.

21. Attached hereto as Exs. 5-10 are redlined versions of the settlement exhibits and claim forms that reflect the clarifications and amendments referenced in this Declaration. I will be prepared to present at the hearing a proposed schedule for disseminating class notice and a final approval hearing. My office will serve this Declaration and the Supplemental Memorandum on the appropriate public officials pursuant to the provisions of the Class Action Fairness Act.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of May, 2012 at San Diego, California.

ALAN M. MANSFIELD
alan@clgca.com
Declarant